**ZIMMERMAN REED LLP**
Caleb Marker (SBN 269721)
caleb.marker@zimmreed.com
Flinn T. Milligan (SBN 323042)
flinn.milligan@zimmreed.com
6420 Wilshire Blvd., Ste. 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

**ZIMMERMAN REED LLP**
Ryan J. Ellersick (*Pro Hac Vice forthcoming*)
ryan.ellersick@zimmreed.com
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone (480) 348-6400
Facsimile (480) 348-6415

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORBY GWINN, individually and on behalf of those similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>BUDGE STUDIOS, INC.,<br><br>  Defendant | Case No.: 5:24-cv-06616<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>1. Violation of "Unfair Prong" of Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*;<br>2. Violation of "Unlawful Prong" of Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*;<br>3. Violation of Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*;<br>4. Violation of California's False Advertising Law, Bus. & Prof. Code §§ 17500 *et. seq.*;<br>5. Intentional Misrepresentation;<br>6. Negligent Misrepresentation.<br><br>JURY TRIAL DEMANDED |

1

## I.   <u>INTRODUCTION</u>

1.     This case is about the unfair and deceptive monetization of mobile gaming apps targeted toward young children.

2.     Defendant, Budge Studios, is one of the largest and most successful mobile game developers for children's apps. Its games have been downloaded over 2 billion times worldwide. Defendant's primary target audience for its apps are young children of preschool and early elementary age.

3.     While Defendant's apps purport to be educational, fun, harmless, and otherwise appropriate for toddlers and other young children, in reality the apps are essentially full-length advertisements disguised as children's games. Not only this, but the nature of the "adver-games" advertising is particularly unfair, particularly when directed to young children.

4.     Children struggle to distinguish advertising from content in the media they consume. This means that all children, but especially young children like Defendant's target audience, are vulnerable to "stealth advertising"—advertising that disguises its commercial nature in some manner, in this case primarily by blending the line between gaming content and promotional content. Longstanding academic research confirms that young children are largely incapable of distinguishing between actual content and advertising even in typical non-"stealth" contexts. The manipulative impact of stealth marketing is exacerbated for young children when fictional characters—with whom children form trusting parasocial[1] relationships—are deployed to pressure in-app purchases.

5.     Rather than consider the vulnerabilities of its audience and craft games that minimize the negative impacts of ad-based games on young children, Defendant intentionally exploits those vulnerabilities through its mobile apps, including Paw Patrol Rescue World ("Paw Patrol"), Bluey: Let's Play; Hello Kitty Nail Salon; Strawberry Shortcake Bake Shop; Barbie Dreamhouse Adventures, and Caillou Check Up: Doctor Visit (the "Subject Apps"). Budge's Subject Apps deploy multiple

---

[1] The Oxford English Dictionary defines "parasocial" as "[d]esignating a relationship characterized by the one-sided, unreciprocated sense of intimacy felt by a viewer, fan, or follower for a well-known or prominent figure (typically a media celebrity), in which the follower or fan comes to feel (falsely) that they know the celebrity as a friend." https://www.oed.com/dictionary/parasocial_adj?tl=true (last visited Aug. 27, 2024).

manipulative and addictive design techniques, stealth marketing, and dark patterns all with the end goal of unfairly and deceptively monetizing what otherwise appear to be free games for toddlers and young children.

6.      Defendant achieves this monetization through the following steps:

a.      Budge works with a television studio, such as Nickelodeon, to develop a mobile game based on popular characters from children's television programs, movies, or toys (e.g., Paw Patrol, Strawberry Shortcake, Bluey);

b.      Budge markets the game to young children who are familiar with the game's characters;

c.      Budge makes the game free to download in order to reach the maximum audience and increase the likelihood of monetizing the app over the long term;

d.      Budge represents to consumers (parents and children) at the point of download that the app is appropriate for young children and toddlers, including but not limited to representations that are textual and pictorial;

e.      Budge structures gameplay in the app in such a way as to maximize the addictive impact of the game and thereby maximize the likelihood that the user will subscribe to the "full" paid version. This includes designing the app to provide for a limited amount of gameplay with lots of front-end "rewards," so the child user becomes hooked on the initial outpouring of prizes, game characters cheering them on, casino-style lights and sounds, and other manipulative and addictive features, and feels a need to repeat these experiences, which become increasingly difficult to access without spending money.

f.      Budge conditions advancement or further gameplay on in-app purchases that are foisted on the child user through various manipulative design techniques and dark patterns, including (1) parasocial relationship pressure, (2) time-based pressure, (3) navigation constraints, and (4) lures;

g.      Budge co-opts the child user to exert pressure on the child's parent/legal guardian to engage in microtransactions and in-app purchases—the ultimate goal and end result of Defendant's unfair and deceptive advertising campaign; and

h.     Even after a purchase is made to subscribe to the game, Budge continues to deploy the same deceptive techniques described above in order to induce the child to download another "free" Budge app, which simply starts the cycle over.

7.     Any one of the strategies employed by Defendant constitutes an unfair and unlawful business practice, particularly when applied to young children. Yet Defendant employs *all* of these strategies—and more—at scale, while at the same time representing to parents that its apps are appropriate even for very young children.

8.     By targeting young children for monetization through deployment of addictive and manipulative design techniques in its games, while representing to parents that its games are appropriate for toddlers and young children, Defendant's conduct violates California's Unfair Competition Law, Consumer Legal Remedies Act, and False Advertising Law. Defendant's conduct also gives rise to common law claims for Intentional and Negligent Misrepresentations.

## II.     JURISDICTION

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and at least one member of the class is a citizen of a State and Defendant is a citizen or subject of a foreign state. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and a member of the class is a citizen of a State and Defendant is a citizen or subject of a foreign state.

10.     This Court has personal jurisdiction over Defendant Budge Studios because Defendant purposefully directed its activities towards California residents such as Plaintiff and purposefully availed itself of the privileges of conducting activities in California. Plaintiff's claim arises out of those forum-related activities and the exercise of jurisdiction would comport with fair play and substantial justice in this case.

11.     Defendant's forum-related activities include the intentional marketing and selling of the Subject Apps to California residents through Apple and Google's app stores, demonstrating that the

company's actions were intentionally directed towards California and that Defendant availed itself of the California-based app store platforms in marketing and selling the Subject Apps.

12.     Plaintiff's claims arise out of Defendant's marketing and selling the Subject Apps in California as Plaintiff reviewed and relied upon Defendant's false advertising while located in California. The Defendant's false advertising to Californians led to the sale of one or more Subject Apps to a California resident, which caused financial harm. By falsely representing to Plaintiff that the Subject Apps are suitable for children, Defendant intended to, and did, induce Plaintiff's reliance in California, and Plaintiff's claims arise from that reliance.

13.     Exercising jurisdiction over Budge Studios would be reasonable and would not violate traditional notions of fair play and substantial justice. The Defendant's deliberate engagement with California residents through false advertising justifies this Court's interest in adjudicating the dispute.

### III.     **VENUE**

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c)(3) because a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendant is subject to the Court's personal jurisdiction with respect to this action, and Defendant is not a resident of the United States.

### IV.     **THE PARTIES**

15.     At all relevant times, Plaintiff Corby Gwinn was and is domiciled in and a citizen of California. Plaintiff is the parent of a child who requested, played, and, through Plaintiff, paid for Defendant's Paw Patrol app and other Subject Apps.

16.     Defendant Budge Studios, Inc., is a corporation existing under the laws of Canada, with its principal place of business located at 5455 Avenue de Gaspe, Suite 540, Montreal, QC H2T 3B3, Canada. Defendant regularly conducts and transacts business in this District and throughout the United States.

## V.   FACTUAL ALLEGATIONS

A.   **"Take it for Free, Try it, Feel it": The "Freemium" Model and Monetizing Children's Online Activities**

17.     Children spend more time online than ever before. A 2021 survey by Common Sense Media found that 88 percent of teenagers from ages 13-18 have their own smartphone, and 57% of children between 8 and 12 have their own tablet.[2]

18.     Additionally, 94 percent of families surveyed with children between 8 and 18 have at least one smartphone in the home, and 74% have a tablet in the home.[3] This same survey found that, on average, 8-12 year olds spend approximately 5.5 hours in front of screens per day.[4] Studies show that children are consuming more digital content than ever.[5]

---

[2] Common Sense Media, The Common Sense Census: Media Use by Tweens and Teens, at 22 (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-finalweb_0.pdf.
[3] *Id.* at 21.
[4] *Id.* at 3.
[5] *See* Melinda Wenner Moyer, *Kids as Young as 8 Are Using Social Media More Than Ever, Study Finds*, N.Y. Times (Mar. 24, 2022), https://www.nytimes.com/2022/03/24/well/family/child-social-media-use.html.

19.     For many children, that digital content comes in the form of mobile games that are downloaded and played on a smartphone or tablet. A 2020 report by Common Sense Media produced the following tables showing children's use of tablets and smartphones:[6]

**TABLE 11. Child's Own Media Devices, by Age, 2020**
0- to 8-year-olds with their own …

|  | All | <2 | 2 to 4 | 5 to 8 |
|---|---|---|---|---|
| Tablet | 44% | 8%[a] | 43%[b] | 61%[c] |
| Smartphone | 8% | 4%[a] | 5%[a] | 12%[b] |
| iPod Touch or similar | 4% | 4%[a] | 5%[a] | 12%[b] |
| **Any mobile device** | **48%** | **9%[a]** | **46%[b]** | **67%[c]** |

**TABLE 12. Use of Mobile Media, by Activity, 2020**
0- to 8-year-olds who have used mobile media to …

|  | All | <2 | 2 to 4 | 5 to 8 |
|---|---|---|---|---|
| Watch online videos | 72% | 30%[a] | 78%[b] | 87%[c] |
| Play games | 65% | 12%[a] | 65%[b] | 90%[c] |
| Watch television/movies | 64% | 26%[a] | 73%[b] | 76%[b] |
| Use apps | 55% | 10%[a] | 52%[b] | 78%[c] |
| Read books | 33% | 7%[a] | 31%[b] | 47%[c] |
| **Any mobile use** | **83%** | **40%[a]** | **93%[b]** | **96%[c]** |

TABLES 11 AND 12:
Note: Items with different superscripts differ significantly (p < .05). Items with no superscript, or those with the same superscript, do not differ significantly. Significance should be read across rows (between age groups).

20.     As the table shows, more than 90% of children aged 2-8, Defendant's core demographic, use mobile apps, with the majority using them for gaming.

21.     The rise in mobile gaming for children has led to an explosion in revenue for game developers. In 2022, mobile gaming revenue in the United States reached a record $41.7 billion.[7]

---

[6] Figure from Common Sense Media, *The Common Sense Census: Media Use by Kids Age Zero to Eight*, Common Sense Media, Nov.17, 2020, available at https://www.commonsensemedia.org/sites/default/files/research/report/2020_zero_to_eight_census_final_web.pdf (last visited May 22, 2024).
[7] https://www.statista.com/topics/1906/mobile-gaming/#topicOverview

22.     The foundation for this rapid monetization of online gaming is the "freemium" business model, as illustrated in the following graphic:



23.     Under the traditional model for gaming monetization, users paid upfront to download and play mobile games. This model had clear revenue streams but limited the audience to those willing to make an immediate, upfront, and one-time purchase. By way of context, purchasing the most recent iteration of the Mario Brothers franchise, available on the child-focused Nintendo Switch handheld console, costs $59.99. Among mobile app-based games, the top game in the Apple App Store at the time of drafting was Minecraft, which sold for $6.99 (though which includes the option for additional in-app purchases). By contrast, a monthly subscription to Defendant's flagship game, Paw Patrol Rescue World, costs $9.99 per month, with payments automatically renewing until the subscriber cancels. Obviously, this means that in just over six months a Paw Patrol Rescue World subscriber would have

spent as much as a Mario purchaser *yet would have nothing to show for their money at the end of six months*. This is due to the fact that paid content only persists within the app for as long as the subscription is active.

24.     In recent years, the "freemium" model emerged as a more lucrative alternative, fundamentally changing the mobile gaming landscape. In the "freemium" model, an incomplete version of the game is offered free of charge, allowing broad and easy access for a vast user base. Revenue is generated not from the purchase price but through in-game advertisements and transactions, including subscriptions. Unlike the traditional model that involved one-time, upfront purchases, freemium games can generate ongoing revenue from active users over an extended period.

25.     The freemium revenue model thrives on in-game advertisements and associated "microtransactions." Microtransactions are small, in-game purchases that allow players to buy virtual goods or benefits that enhance their gaming experience or allow them to unlock additional levels or gaming features. For example, in Paw Patrol the child can pay to have access to the full roster of playable "pups" from the show, but such purchase is *required* to progress beyond the limited "teaser" of free gameplay. The term "micro" refers to the relatively low cost of these transactions, although the price can vary widely depending on the game and the item being purchased, and the cumulative value of such transactions can quickly reach the hundreds or even thousands of dollars.

26.     Thus there are several ways a game can be monetized: 1) the traditional up-front model (though notably many games which are *not* free to download also contain microtransactions and, indeed, even if a consumer subscribes to one of Defendant's subscription model freemium games, such as Paw Patrol Rescue World, that does not even guarantee complete access as Defendant still sells "packs" or "bundles" of features in one-time microtransactions on top of the subscription fee); 2) the subscription model in which features are unlocked so long as the consumer keeps current with recurrent fees; 3) an advertising revenue model, in which the full game is available for free but play is burdened with advertisements from third-party advertisers; and 4) a microtransaction model, in which the game is free to play but "extras" are available for purchase.

27.     Many games developers, including Defendant, make use of a combination of these methods. For example, Paw Patrol Rescue World subscriptions cost $9.99 per month, but the game also

9

allows one-time purchases for certain characters or areas, such as $9.99 to be able to play as the character Everest (a dog).

28.     Because the freemium model is more lucrative to game developers than the traditional model, the freemium model has seen widespread adoption in the mobile gaming space, including apps and games targeting young children. This has resulted in a child-app ecosystem dominated by in-game advertising that blurs the lines between gaming content and stealth marketing designed to induce repeated microtransactions, excessive exposure to ads, or, as in Defendant's "games," both.

29.     The freemium model now generates 90% of the Apple App Store's revenue, with only 10% coming from games that must be purchased to download.[8] And game developers have discovered the secret recipe based on human psychology and dopamine rewards systems for prolonging gameplay and inducing in-app purchases.[9]

30.     Defendant is one of the pioneers of the freemium model in the children's app space. In a 2015 presentation by one of the Budge Studios co-founders, Michael Elman, Elman explained their model as follows: "We give you a part of the [] product enough to take it for free, try it, feel it. And then if your child enjoys it, if they're engaging with it, then there's additional content to unlock where they can get a full experience and all the other things that come with it. And we've had a lot of success in [] doing so."[10]

**B.    "Overwhelm the Defenses": The impact of advertising on young children**

31.     A recent study noted that young children "lack a meta-awareness about advertising and are unable to critically reflect upon their reactions to it. When advertisements are combined with rewards, both cognitive and emotional processes respond to persuasion. In the case of the gamified ads []—those involving watching ads to collect tokens or gameplay items—children under 6 years may be especially susceptible to this approach because of their responsiveness to positive reinforcers."[11]

---

[8] https://www.psychguides.com/interact/the-psychology-of-freemium/
[9] *Id.*
[10] https://www.youtube.com/watch?v=EnkOmqBVNSY (at 2:50).
[11] Meyer, M., Adkins, V., Yuan, N., Weeks, H. M., Chang, Y., & Radesky, J. (2018). Advertising in Young Children's Apps: A Content Analysis. *Journal of Developmental & Behavioral Pediatrics*, 7, https://journals.lww.com/jrnldbp/Abstract/publishahead/Advertising_in_Young_Children_s_Apps___A_Content.99257.aspx.

32.     Existing research shows that children are not even aware of ads until 4-5 years of age.[12] Further, even when children can differentiate between an advertisement and non-sponsored content, they still have great difficulty understanding the intent of the advertisement (i.e. to get them to spend money), with children of age 6-7 predominantly viewing advertisements as informational programs that are used as "a break for either the people working on television or the viewers."[13]

33.     A 2011 study found that most children's understanding of the "selling intent" of television food advertising didn't emerge until around 7-8 years, reaching 90% by 11-12 years.[14]

34.     Additionally, research shows that many children under 7 have not developed what psychologists call "theory of mind" (i.e. the ability to think about the thoughts and feelings of others) and thus have difficulty understanding persuasive intent,[15] as needed to distinguish between content and advertisements.

35.     Children are particularly vulnerable to messaging delivered by characters in the media they consume. Children form deep attachments to such characters and have robust parasocial relationships in which they even view the characters as friends.[16] Researchers have found that "children are known to develop trusting emotional parasocial relationships with media characters and pay more

---

[12] Kunkel, D. (2012). Child and Advertising: Content, Comprehension, and Consequences. *HANDBOOK OF CHILDREN AND THE MEDIA 395*, 403; Wilcox, B. L., Kunkel, D., Cantor, J., Dowrick, P., Linn, S., & Palmer, E. (2004) Psychological Issues in the Increasing Commercialization of Childhood, *American Psychological Association*. https://www.apa.org/pi/families/resources/advertising-children.pdf

[13] Andronikidis, A. I., & Lambrianidou, M. (2010). Children's understanding of television advertising: A grounded theory approach. *Psychology and Marketing*, *27*(4), 299–322, 316. https://doi.org/10.1002/mar.20333

[14] Owen B J Carter et al. (2011). Children's understanding of the selling versus persuasive intent of junk food advertising: implications for regulation. *Social Science & Medicine*, 72(6), https://www.sciencedirect.com/science/article/abs/pii/S027795361100061X?via%3Dihub

[15] See Matthew A. Lapierre et al., The Effect of Advertising on Children and Adolescents, 140: S2 PEDIATRICS S152, S153 (2017), https://doi.org/10.1542/peds.2016-1758V.

[16] Bond, B. J., & Calvert, S. L. (2014). A model and measure of US parents' perceptions of young children's parasocial relationships. *Journal of Children and Media*, *8*(3), 286–304. https://doi.org/10.1080/17482798.2014.890948.

attention to and learn better from familiar characters."[17] This is especially true of younger children.[18] Using in-game characters to promote purchases preys upon a child's innate sense of trust.

36. So strong is this natural childlike tendency to "befriend" and trust a character, that studies have demonstrated that use of a character can influence children about the very *taste* of a breakfast cereal, even overriding their own sensory subjective impressions of how food tastes.[19] This is seriously powerful stuff.

37. Notably, the American Psychological Association recommends no advertising should be directed to children below the ages of 7-8 years because below this age most do not recognize the selling intent of advertising.[20] Despite this, even in 2004—years before the invention and ubiquity of the smartphone—the APA observed that the growth of private media consumption by children (then, televisions in the bedroom, now smartphones/tablets) had led to a dramatic increase in advertising directly intended for children, and estimated that children view more than 40,000 commercials each year.

38. Concerns over the impact of advertising on children led Congress to pass the Children's Television Act of 1990. That legislation memorialized Congress's findings that "special safeguards are appropriate to protect children from overcommercialization on television," and that "television station operators and licensees should follow practices in connection with children's television programming and advertising that take into consideration the characteristics of this child audience." The Children's Television Act directed the Federal Communications Commission ("FCC") to promulgate rules

---

[17] Meyer et al. 7, citing Brunick, K.L., Putnam, M.M., McGarry, L.E., et al. (2016). Children's future parasocial relationships with media characters: the age of intelligent characters. *J Child Media*, *10*. 181–190.

[18] Rosaen, S. F., & Dibble, J. L. (2008). Investigating the relationships among child's age, parasocial interactions, and the social realism of favorite television characters. *Communication Research Reports*, *25*, 145–154. doi:10.1080/08824090802021806.

[19] Lapierre, M. A., Vaala, S. E., & Linebarger, D. L. (2011). Influence of licensed spokescharacters and health cues on children's ratings of cereal taste. *Archives of Pediatrics & Adolescent Medicine*, *165*(3), 229–234.; Roberto, C. A., Baik, J., Harris, J. L., & Brownell, K. D. (2010). Influence of licensed characters on children's taste and snack preferences. *PEDIATRICS*, *126*(1), 88–93. https://doi.org/10.1542/peds.2009-3433.

[20] Kunkel et al, *Report of the APA Task Force on Advertising and Children*, American Psychological Association, Feb. 20, 2004, available at https://www.apa.org/pi/families/resources/advertising-children.pdf (last visited May 22, 2024).

requiring television programmers to "limit the duration of advertising in children's television programming to not more than 10.5 minutes per hour on weekends and not more than 12 minutes per hour on weekdays."

39.     In addition to these requirements, since 1974 the FCC has required television programmers to adhere to requirements that advertising in children's programs be clearly separated from program content. Known as the "separation principle," this requirement imposes "bumpers" between programing and advertising content (e.g., "and now for a commercial break") and a prohibition on the use of program talent to deliver commercials.[21] The federal government is well aware of the profound danger of allowing businesses to market directly to children via the media they consume in increasingly large quantities.

40.     No similar regulations govern the conduct of mobile game developers. This has resulted in a "wild west" environment in which toddlers and other young children are subject to a barrage of sophisticated and manipulative advertising designed to co-opt children's attention, foster addictive and compulsive use, and, ultimately, induce in-app purchases.

41.     This is despite the fact that a growing body of evidence shows that children have *even less* understanding of online advertising than television advertising, with studies finding that children have even lower awareness of advertising on websites compared with television, and greater difficulty recognizing it.[22] One researcher observed that the blurring of content and ads which is the core feature of stealth marketing "may simply overwhelm the defenses children are still in the process of building."[23]

42.     While stealth marketing may be permissible in some circumstances when targeting adults, "these are children we're talking about." *Colvin v. Roblox Corp.*, No. 23-cv-04146-VC, 2024 U.S. Dist. LEXIS 54224, at *7 (N.D. Cal. Mar. 26, 2024). The strategies and tactics discussed in this

---

[21]https://www.fcc.gov/media/radio/public-and-broadcasting#:~:text=There%20are%20three%20applications%20of,which%20the%20Commission%20defines%20as%20%E2%80%9C

[22] *See, e.g.,* Packer et al, *Advertising and Young People's Critical Reasoning Abilities: Systematic Review and Meta-analysis*, Pediatrics (2022) 150 (6), Nov. 2022, available at https://publications.aap.org/pediatrics/article/150/6/e2022057780/189944/Advertising-and-Young-People-s-Critical-Reasoning?autologincheck=redirected (last visited Aug. 27, 2024)

[23] Moore, E.S., *Children and the Changing World of Advertising*, Journal of Business Ethics, 52(2), 165, available at https://link.springer.com/article/10.1023/B:BUSI.0000035907.66617.f5 (last visited May 22, 2024).

Complaint would be unfair as to most adults and are profoundly so when used against young children. "Overwhelming the defenses" of small children to get them to spend their parents' money is not normal advertising, it is unfair competition.

**C.    FTC Raises Alarm over Stealth Marketing and Dark Patterns in Online Advertising**

43.    In recent years, the Federal Trade Commission ("FTC") has raised alarms over online advertising targeting children with dark patterns and stealth marketing techniques. In September 2022, the FTC issued a staff report titled "Bringing Dark Patterns to Light," which highlighted the prevalence of dark patterns—design practices that trick or manipulate users into making choices they would not otherwise make—in children's apps and other online content.[24] The report identified, for example, a dark pattern in the form of "Parasocial Relationship Pressure," involving the use of "characters that children know and trust to pressure them into making a certain choice" like making "in-app purchases."[25]

44.    In September 2023, the FTC issued another staff report titled "Protecting Kids from Stealth Advertising in Digital Media." That report followed an October 2022 workshop where various experts in child psychology and other disciplines spoke on the impact of "blurred" or "stealth" advertising on children.

45.    As the science showing that children are *already* unable to effectively distinguish advertisements from content would predict, online applications that intentionally blur the line between content and advertisements are extremely powerful when employed against children.[26]

---

[24] https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf

[25] *Id.*, Appendix A at 21.

[26] https://www.ftc.gov/newsevents/events/2022/10/protecting-kids-stealth-advertising-digital-media FTC Kids Advertising Event, Remarks of Grace Ahn ("Ahn Remarks"), at 1:01, 1:59; Remarks of Liselot Hudders ("Hudders Remarks"), at 1:44. As the FTC notes, "This concern is not new, nor is it unique to digital media. In 1974, the Federal Communications Commission ("FCC") highlighted "the need for maintaining a clear separation between programming and advertising," finding that "an advertiser would have an unfair advantage over listeners if they could not differentiate between the program and the commercial message and were, therefore, unable to take its paid status into consideration in assessing the message." Children's Television Programs, Report and Policy Statement ("FCC Policy Statement"), 39 Fed. Reg. 39,396, 39,399, 39,401 (Nov. 6, 1974)." https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf n. 20.

46.     Simply put, in the words of the FTC, "ads that are blended into content are less distinguishable to kids" who are already "overwhelmed" in their inability to effectively distinguish ads from content.[27]

47.     As stated by the FTC: "Continuing questions about kids' ability to recognize blurred advertising should concern marketers who nevertheless engage in the practice. Younger children tend to lack the knowledge and skills that would allow them to recognize and evaluate ads ("ad literacy"). These skills include: recognizing brands and products; researching and thinking critically about products; determining rules to use when making decisions; developing bargaining and negotiation strategies; and understanding influence, intentions, and motives. There is no specific age at which kids develop each of these skills. Consumer advocates and academics note that these issues make it difficult for kids to recognize the difference between advertising and authentic content."[28]

48.     Stealth marketing used against children very effectively exploits the natural weaknesses of children, including by intentionally removing or manipulating the context-cues that children rely on to navigate digital spaces.[29] This includes showing ads where the "X" to close the ad is unreasonably small, ineffective, or simply absent (as in many of Defendant's ads). Thus, even where parents have taken the time—not an option for parents who lack the education, means, or time—to teach their children some basic "ad literacy," such as knowing not to click on ads and to look for the little "x" in the corner, the stealth advertisers, like Defendant, are one step ahead.

---

[27]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at 4. The FTC cites to the remarks of Nellie Gregorian at the FTC workshop, as well as to a note that "The FCC has said 'program-length commercials, by their very nature, are extremely serious violations of the children's television commercial limits, stating that the program-length commercial policy 'directly addresses a fundamental regulatory concern, that children who have difficulty enough distinguishing program content from unrelated commercial matter, not be all the more confused by a show that interweaves         program         content         and         commercial         matter."  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf citing "Gregorian Remarks, at 3:40" and "Notice of Apparent Liability for Forfeiture, FCC 22-70 ¶3 (Sept. 19, 2022).
[28]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at 5.
[29]  Femke Loose et al., A Qualitative Approach to Unravel Young Children's Advertising Literacy for YouTube Advertising: In-Depth Interviews with Children and their Parents, Young Consumers: Insight and      Ideas      for      Responsible      Marketers,      at      17      (Oct.      2022), https://www.researchgate.net/publication/364756625_A_qualitative_approach_to_unravel_young_children%27s_advertising_literacy_for_YouTube_advertising_in-depth_interviews_with_children_and_their_parents.

49.     Experts who presented at the FTC event noted that even if a child recognizes they are seeing an advertisement, they may lack the critical thinking and skepticism to ensure that the child is considering bias and persuasive intent, particularly where exercising such skills, if possible at all, would lead to missing parts of the game or other content due to the embedded nature of the advertisement. The FTC notes that when children are seeing hundreds of embedded advertisements in a day, as they now are, it is unlikely that they will have the capacity to stop and evaluate each one.[30]

50.     The FTC also notes, with regard to parasocial relationship pressure, that "[i]f kids think they are friends with an avatar or virtual agent, or they feel a kinship to a celebrity or influencer they follow on social media, their trust for these individuals and the feeling that the individuals are speaking directly to them might cloud their understanding of the persuasive intent."[31]

51.     The FTC isolates key harms caused by stealth advertising to children of the type perpetrated by Defendant. These include:

a.  Trustworthiness/Authenticity: the FTC is concerned that avatars may appear to be authentic and genuine figures for kids and children may develop relationships with them over time, and kids may be less skeptical of embedded ads because the content is from figures they trust.

b.  Classical Conditioning/Cultural Effects: the FTC is concerned that embedded advertising can create positive emotions and result in "classical conditioning," which may be due to the parasocial relationships kids have with avatars.

c.  Disproportionate Effects on Certain Populations: according to the FTC, research suggests that certain populations have more significant impacts from stealth advertising, particularly where there is an increase in digital media usage, parents have fewer resources to contribute to their child's ad literacy, English is not the

---

[30]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at 6-7.

[31]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at 7 citing Radesky Remarks, at 1:50.

1  parents' native language, and/or the population is more likely to be targeted with
2  potentially problematic ads.[32]

3  52.  This problem of stealth advertising to vulnerable children is not going anywhere.
4  According to the FTC, "spending to market children's products and services [in content and
5  programming] . . . reached more than $1.6 billion in 2022" with 70% spent in digital spaces.[33] However,
6  the FTC warns that "marketers that engage in blurred advertising should be mindful that while it may
7  be profitable, the practice can put children at risk of harm and violate Section 5 of the FTC Act,"[34] which
8  is interpreted in "parallel" to California's UCL. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20
9  Cal. 4th 163, 185 (1999) (citation omitted)).

10  **D.  "This Avoidable Source of Family Stress": Academic Research Confirms the Prevalence**
11  **of Manipulative Advertising in Children's Apps**

12  53.  Recent academic research has confirmed the widespread use of deceptive advertising in
13  children's apps and mobile games.

14  54.  Between December 2017 and March 2018, researchers in the Division of Developmental
15  Behavioral Pediatrics at the University of Michigan Medical School, through a comprehensive research
16  design, analyzed the content of 135 apps marketed to or played by children under five years of age,
17  which they selected from two sources.[35] They reviewed 39 (35 free and 4 paid) apps captured as part of
18  a study of family mobile device use, and the 96 (50 free and 46 paid) most popular apps—that is most
19  frequently downloaded—in the "Ages 5 and under" category of the Google Play store. At the time the

---

22  [32]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at
23  7-8.
24  [33]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at
8 citing  Karlene Lukovitz, Ad Spend in Kids' Content/Media Leapt Nearly 50% in 2022, Driven By
Digital         Video,         Digital         News         Daily         (Jan.         19,         2023),
25  https://www.mediapost.com/publications/article/381723/ad-spend-in-kidscontentmedia-leapt-nearly-
50-i.html.
26  [34]  https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf  at
8.
27  [35]  Meyer, M., Adkins, V., Yuan, N., Weeks, H. M., Chang, Y., & Radesky, J. (2018). Advertising in
Young Children's Apps: A Content Analysis. Journal of Developmental & Behavioral Pediatrics, 1-8,
28  https://journals.lww.com/jrnldbp/Abstract/publishahead/Advertising_in_Young_Children_s_App    s
A_Content.99257.aspx.

**CLASS ACTION COMPLAINT**

research was conducted, the majority of apps analyzed had been downloaded more than ten million times each, in some cases upwards of 50 million times.

55.     Ninety-five percent of the apps analyzed contained at least one type of advertising.[36] Much of this advertising was embedded into games or activities in manipulative ways, such as requiring children to view ads to continue playing or to unlock play items or encouraging the purchase of play items or a more desirable, paid, version of the app, as with Defendant's "games."

56.     The University of Michigan report found that the advertising approaches commonly employed by the children's apps "appeared to show a range of potentially disruptive (i.e., interrupting the child's gameplay) or persuasive characteristics."[37] The researchers noted that Section 5 of the FTC Act prohibits "deceptive advertising and marketing practices, defined as 'a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment,'" and said "it is likely that persuasive, gamified advertising practices in children's apps would fit under this designation when children are the intended audiences."[38]

57.     In a more recent study from 2022, researchers at the University of Michigan conducted a "cross-sectional study of apps used by 160 children aged 3 to 5 years," and found that "the majority of apps were associated with manipulative design features that included parasocial relationship pressure, fabricated time pressure, navigation constraints, and use of attractive lures to encourage longer gameplay or more purchases, in addition to advertisement-based pressure; only 20% of apps had no manipulative design features."[39]  The 2022 study also found a disproportionate impact on lower-income households, observing that "[c]hildren from lower socioeconomic strata played apps with more manipulative design."

---

[36] *Id.*, 14.
[37] *Id.*, 3.
[38] *Id.*, 7.
[39] Radesky, J., Hiniker, A., McLaren, C., Akgun, E., Schaller, A., Weeks, H., Campbell, S., Gearhardt, A.,  Prevalence and Characteristics of Manipulative Design in Mobile Applications Used by Children. JAMA                         Network                         Open, PhD5https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2793493?utm_source=For_The_ Media&utm_medium=referral&utm_campaign=ftm_links&utm_term=061722

CLASS ACTION COMPLAINT

58. According to the study's findings, four out of five children's apps used manipulative design techniques. Those techniques fell into four general categories: **(1) parasocial relationship pressure, (2) time-based pressure, (3) navigation constraints, and (4) lures**.

59. **Parasocial relationship pressure** refers to using app characters to pressure children to prolong gameplay or make purchases. Examples included characters saying things like "Don't just stand there, buy something!" when children were on the store page of the app, or the game narrator saying, "You can play with these cute animals for a tiny fee! Ask your parents!" In extreme cases, such as Defendant's Paw Patrol app, characters will use guilt against the little kids, implying, for example, that they could "save" someone in need of rescue if they would only cough up the dough. Where, as with mega franchises like Paw Patrol, children already have a positive, trusting relationship with the characters, the advertiser's job is only made easier.

60. **Time-based pressure** refers to visual indicators conveying scarcity of time. According to the study, "[a]pps displayed countdown clocks and other visual indications of time running out, which is known to interfere with decision-making." These time-based pressure techniques were deployed to induce both extended game play and in-app purchases. This tactic is employed by Defendant in numerous ways, including through the advertising of time-limited special offers presented via gameplay-interrupting ads.

61. **Navigation constraints** refer to "[f]eatures like tunneling (providing no options for where to go next), pop-ups, or auto-advancing . . . used to prolong gameplay . . . and to promote purchases." Examples included pop-up messages, such as "Come back tomorrow and get a dragon" to entice return to gameplay, or prompts to purchase items between each level. Defendant also uses this tactic against its toddler users. For example, gameplay in Paw Patrol Rescue World is rigidly linear right up until the ads start showing up, forcing child players into a "pipeline" that leads only to payment or disappointment.

62. **Lures** refers to bringing attention to an attractive object—like stickers, trophies, or leaderboards—just as a child is trying to make a decision. According to the study, "[l]ure purchase pressure usually involved sparkles, pulsing buttons, exclamation points, brightly colored banners that obscure other items, or other attention-grabbing cues on pages where money would be spent." Defendant

makes extremely widespread use of this tactic against its child users, as evidenced by the screenshots presented *infra*.

63.     The study's lead author commented, "Our findings suggest that design features created to serve the interests of technology companies over children is common and we need more regulations in place. These design tricks disproportionately occur in apps used by children from disadvantaged socioeconomic backgrounds, suggesting inequities in how young children's attention is exploited for monetization."[40]

64.     The lead author also explained that "[a]dult users might expect to be targeted by ads through apps on digital devices. But children are too young to understand this type of persuasive design that disrupts their game playing. Parents often say their children refuse to hand over devices when it's time to do something else—like come to dinner or get ready for bed—and the gameplay-prolonging design tricks we found are likely contributing to this avoidable source of family stress."

65.     The study's author concluded with this observation: "Children are avid users of the digital world and deserve access to its opportunities without having to navigate the glut of profit-centered design that currently dominates the market."

**E.     "Hey, Let's Be Friends!": Defendant's App "Paw Patrol Rescue World" Deploys Multiple Manipulative Design Techniques to Induce In-App Purchases**

---

[40]     https://www.michiganmedicine.org/health-lab/design-tricks-commonly-used-monetize-young-childrens-app-use

66.     Defendant markets its apps as educational and appropriate for children of young ages, as reflected on Defendant's "About Us" webpage:

# Apps Designed to Inspire Kids' Imaginations

At Budge™, our mission is to thrill, educate and entertain children around the world through creative and innovative apps. We use the power of technology to allow kids to go on amazing adventures and add a whole new dimension to play.

With over **2 Billion downloads** of our apps worldwide, and with our diverse portfolio we have something to suit every taste.
Come play with us!

67.     On the Apple App Store, Defendant specifically markets its Paw Patrol app as a "Preschool Toddler Kids Game" for children as young as four-years old. Under the "Age Rating" on the App Store, Defendant represents: "4+, Made for Ages 0-5." On the Google Play Store, Defendant represents that the Paw Patrol app is a "Preschool & Toddler children" game. Budge Studios authors the content of these descriptions.[41] The Paw Patrol icon, featuring the familiar characters from the child television show, is also prominently displayed on the download screen, conveying the uniform message that the game is appropriate for young children.

---

[41]     https://support.google.com/googleplay/android-developer/answer/13393723?hl=en     (Google); https://developer.apple.com/app-store/product-page/ (Apple).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20    68.    Despite being targeted at very young children, Defendant deploys multiple manipulative

21  and addictive design techniques, dark patterns, and stealth marketing tactics intended to prolong

22  gameplay and induce in-app purchases.

23    69.    While Plaintiff did not rely on representations outside of the app store, it is worth noting

24  that if a parent were to take it upon themselves to do further research, Defendant's online materials only

25  enhance the false "kid friendly" representation in the app stores. The marketing page on Defendant's

26  website contains further misrepresentations, including that children can "Play as [their] favorite pup!"

27  But Defendant is lying to its child audience, as the only pups who can be accessed for free are two (the

28  pink one and the blue one), whereas the rest require payment. And if there were any doubt as to

Defendant's intent to create and exploit parasocial relationships, such are dispelled by Defendant's sign-off on the page:



70.     The initial gameplay in Paw Patrol Rescue World is dominated by various "lures" in the form of rewards, prize boxes, fireworks when the prize boxes are opened, and enthusiastic encouragement and praise from the game narrator. This cycle repeats itself, with each lure building off the prior lure, for the first several minutes of gameplay.

71.     For example, during the initial gameplay there are clear instructions from the narrator—who is a popular human child character from the franchise—to find various items, which, together with collecting "pup treats," along the way, leads to obtaining "prizes" from a "gift box."

72.     As the "gift boxes" are opened, there's an explosion of fireworks as successive prizes appear, each triggering rewards of additional "pup treats," and more "gift boxes" filled with "prizes." This is a classic lure, obviously intended to induce floods of dopamine and compel further play.



73.     Eventually, after this cycle repeats itself several times, hooking the child user to the pattern of (1) following the narrator's directions and encouragement and (2) receiving variable rewards, the game narrator encourages the child to add an additional "pup" to the user's profile. The child user is unable to advance in the game without making a selection from among 14 options, only one of which is free. However, the only indication that the other "pups" are locked is a small green key icon, meaning that children will click on their favorite pup, not realizing it is locked.



CLASS ACTION COMPLAINT

74.     By clicking on one of the 13 options that is locked, the child is taken to an advertisement for a "Special Offer!" where the game narrator—again, a trusted character from the show—encourages making a purchase. While this is a textbook lure (for extra emphasis, the "Subscribe Now!" button pulsates), it is also an example of manufactured time pressure as it implies that the "SPECIAL OFFER" is not always available.



75.     If the child clicks the back arrow in the top left corner of the screen, the child is not returned to the game itself, but is instead taken to another advertisement:



1

76.     To exit the advertisement, the child must click the back arrow a second time, at which

2

point the child is returned to the game. Immediately upon returning to the game, however, the child is

3

hit with a pop-up advertisement. The "X" to exit from the advertisement is shaded in the same color as

4

the ad, making it difficult to navigate away, especially for children with developing motor skills and

5

digital awareness, and creating the impression that it is not possible to skip the ad, a form of navigation

6

constraint:



7
8
9
10
11
12
13
14
15
16
17

18

77.     If the child successfully exits the advertisement, the child is finally returned to the game.

19

But at that point there is no natural progression to the game; the guidance disappears, no new "missions"

20

or activities appear, and the child is left to wander aimlessly while navigating a labyrinth of in-game

21

advertising.

22

78.     For example, numerous features and landmarks appear to be part of the game but in

23

reality are embedded advertisements—such as the "Squid Land" icon below—that, if clicked on,

24

generate a prompt (in the voice of the game narrator) to make a purchase.

25
26
27
28



79. Similarly, if the child rolls over one of the many "paw" icons scattered throughout the game, images of potential prizes and added game features appear along with prompts—again in the voice of the game narrator—to add additional Paw Patrol members through purchases, such as:

    a. "The more pups you add, the more prizes you'll win!"

    b. "To get that prize, the Paw Patrol needs more members!"

    c. "More pups are waiting to join up and help. Add another to the team to access more prizes!"



80.     Sometimes, even these embedded advertisements and prompts from the game narrator to purchase items are interrupted by other pop-up advertisements (literally ads on top of ads), which for the first several seconds do not even provide an "X" to exit from the ad:



F.      **The Types of Dark Patterns and Other Manipulative Designs Employed by Defendant in Paw Patrol Rescue World**

81.     **Parasocial Relationship Pressure:** The Paw Patrol app exploits the "parasocial relationships" young children form with game characters, using the voice of the game narrator to provide both encouragement and praise for gameplay and also to prompt in-app purchases through embedded advertising. Given the rescue-oriented gameplay of the app, children are made—by their favorite TV characters—to feel *guilty* or *bad about themselves* for failing to properly staff their rescue teams, as they are unable to "help" their "friends" without doing so. For example, when the child attempts to select a pup that they have not paid for, an ad screen is launched which plays audiovisual commercials for the game's hidden features on a constant, infinite loop. The exhortations include pressure to purchase to allow the child to "**Help**[] out **our friends** as you explore" and the threat that "Paw Patrol **needs your help** to keep Adventure Bay **safe**!" In other words, four-year-olds are being explicitly told by a beloved

favorite television character and "friend" that if they don't succeed in pressuring their parents into subscribing, their *friends will be unsafe*. Thus, the harmful effects of this cruel and inappropriate coercion are felt by children and their parents even, or especially, when they do not lead to a purchase.

82. **Time-Based Pressure Tactics:** Defendant's app also uses "time-based pressure tactics," such as advertising implicitly time-limited "special offers" to induce in-app purchases and encouraging the child to continue collecting "pup treats" ("Almost there to win a prize!") in order to keep the child playing for as long as possible, thus increasing their exposure to in-game advertising and their likelihood of becoming addicted to the game.

83. **Navigation Constraints:** Defendant's app also deploys various "navigation constraints," which take the form of the child being left to wander aimlessly through a maze of in-game advertisements, without any clear directions or prompts on how to progress through the game. The child has essentially three things available as they navigate the world without paying up: they can replay the handful of free activities, they can gloomily window-shop the numerous tantalizing activities they cannot access, or they can pay up. Additionally, the sudden switch from directed, goal-oriented gameplay in the first few minutes to complete abandonment of the child if he or she declines to pay up further pressures the child to pay for the subscription so that they can reenter the dopamine-rich gameplay pipeline of tasks and prizes.

84. The "navigation constraints" also take the form of near-constant pop-up advertisements, which, in some instances, are so pervasive that the pop-ups interrupt other in-game advertising. If advertising on top of advertising was not enough, the pop-ups often provide no way for the child to navigate away from the advertisement, a classic navigation constraint.

85. **Disguised Ads:** Defendant's app, apart from the small handful of free activities, is more an advertisement than it is a game. Having a beloved character exhort children to purchase something is advertising, albeit a cruel and unusual form thereof. Additionally, every single greyed-out activity, character, or item constitutes a disguised ad: the only reason for presenting these inaccessible-without-payment to children is to cause them to pay for them, typically by *making them feel bad* in some way if

they don't. An advertising strategy that relies on making four-year-olds feel bad about themselves is unfair competition. The FTC has described "disguising ads" as a "dark pattern."[42]

86.  **Comparison Prevention:** Comparison prevention is as it sounds: artifices that prevent the side-by-side comparison of offered products or services. Defendant engages in this in Paw Patrol Rescue World by having only greyed out icons for purchasable/subscribable content, giving the child no way whatsoever to determine what spending $9.99 a month will get them.

87.  **Confirmshaming:** This dark pattern involves the emotional manipulation of the user into doing something they would otherwise not do.[43] "Confirmshaming" is Paw Patrol Rescue World's *raison d'etre* and includes the parasocial relationship pressure discussed. Having a beloved character recommending purchases is unfair in all cases when used against children, but is particularly heinous when they employ emotions like guilt to coerce little kids into purchases.

88.  **Nagging:** This recognized dark pattern involves repeated interruptions with requests for the user to take some action, typically one not in their best interests. Defendant's app "nags" children with such intensity and ferocity that it will literally interrupt ads with more ads.

89.  **Visual Interference:** This dark pattern typically involves barriers to seeing information in a clear and predictable way. In Paw Patrol Rescue World this includes the fact that ads are presented without a clear method of escape, such as a little "x." Additionally, Paw Patrol engages in this dark pattern by presenting the paid-only content as greyed-out but visible "locations" on the game's map, which entice and confuse children who expect an activity when they visit that location and instead get only more ads.

90.  **Fake Scarcity:** When Defendant presents its advertisement for its subscription (see images *supra*) it presents it as a "Special Offer" with a stricken-through "former price" of almost double. While it does not use time-limiting words, it clearly plays upon anxieties that this "Special" offer is going away; if the offer is always available (as appears to be the case in reality), it is not "Special." The entire point of this ad is to make it appear that the subscription is a better deal than it is, which is an

---

[42]  https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.
[43]  https://www.deceptive.design/types.

unfair practice, particularly when used against small children. (Combining fake scarcity with a classic lure, the "Subscribe Now!" button even flashes.)

91. **Lures:** Finally, Defendant's app deploys multiple "lures" in the form of rewards, prize boxes, casino-style effects (fireworks and glittering lights), pulsing buttons for in-app purchases, and other manipulative and addictive designs intended to hook the child user to the game and induce microtransactions. The emphasis on "prize boxes" and the associated casino-style effects and rewards are similar to "loot boxes," which are a recognized gateway to gambling and related addictive behaviors.[44] This use of variable rewards to keep users engaged is a well-known phenomenon, and is the same mechanism that keeps players sitting in front of slot machines for hours on end in a semi-hypnotic state known as the "Vegas Effect."[45] It is highly concerning that there is anything materially common between apps targeting toddlers and professional casinos, particularly where that commonality is by design.

92. The FTC has noted that "[d]ark patterns are not used in isolation and tend to have even stronger effects when they are combined."[46] Defendant combines numerous such tactics and deploys them against the population *least well equipped* to resist them.

93. As reflected in the 2022 University of Michigan Study, any one of these manipulative design techniques—"parasocial relationship pressure, fabricated time pressure, navigation constraints, and use of attractive lures to encourage longer gameplay or more purchases"—are exploitative of young children and their developing minds. Defendant deploys all of them, and more besides.

94. The fundamental unfairness of Defendant's scheme is manifest. Millions of young children fell in love with the show Paw Patrol; they enjoy the story and design, and they simply want to spend more time with those characters, having fun together. The children get their parents to download the app, and they are immediately flooded with "lures," sensory bombardments, and rewards for performing the most trivial of tasks. This feels good, the child is having fun with their digital friends

---

[44] https://www.forbes.com/sites/jasonwosborne/2023/05/25/how-loot-boxes-in-childrens-video-games-encourage-gambling/?sh=28833ac5653d
[45] https://www.psychologytoday.com/us/blog/tech-happy-life/201901/the-vegas-effect-our-screens
[46] https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf

(and the game is sure to remind them, frequently, that these characters are the child's friends), and is being (over)stimulated with animations and sounds. Then the ads start, here and there at first, then more and more until there are literally ads on top of ads. The ads are pitched by the Paw Patrol characters themselves—with whom the child has formed a trusted bond and friendship. "The more pups you add, the more prizes you'll win!" the child is told. Of course, the child doesn't know this is an ad; she thinks it's part of the game.[47]  And that's by design.

95.     Aside from guilting and tricking toddlers, Defendant also seeks to incentivize them with valueless prizes which can only be obtained through purchase, with language such as "[m]ore pups are waiting to join up and help. Add another to the team to access more prizes!" Without making a purchase, the child is left to wander the digital wasteland of Defendant's app while facing a near constant barrage of stealth marketing and dark patterns, largely in the form of their favorite characters guilting and coercing them, or fun-looking locations that have doors barred to non-paying visitors. Eventually, the child succumbs to the pressure, and, having been co-opted by Defendant's manipulative design techniques, the child then exerts pressure on her parents to make a purchase *exactly as intended by Defendant*. They too succumb, signing up for $9.99 a month, and Budge reaps the massive financial rewards of its unfair and deceptive business model.

96.     This cycle repeats itself as the child is continuously exposed to additional ads for Budge apps, even after paying for the subscription version. Budge conceals this information from parents/legal guardians, giving the false impression that paying for the subscription model will stop the onslaught of advertisements. But the ads keep coming, and when the child inevitably burns out on the paid-for game, the child is manipulated into pursuing Budge's other apps through the same dark patterns and stealth marketing that induced the initial purchase, thrusting the child and parent into a perpetual loop of manipulation, deception, and mis-informed purchases.

97.     Notably, Budge is unlike some other app makers in that the ads it runs (constantly) are not third-party ads. In other words, the ads Budge runs are not ads for other companies selling their goods and services who have paid Budge for advertising space. The reality is more problematic and

---

[47] Ironically, this misapprehension is correct in its inverted form: the game is simply part of the ads.

constitutes the keystone of Budge's entirely unfair business practices: the ads in the Subject Apps are all *for more Budge games*. Budge thus creates a self-reinforcing, self-sustaining *system* of games, through which children are essentially cycled through repeated loops of lures, coercion, disappointment, and parental pressure. When a child becomes bored of Paw Patrol, sure enough there's an ad for Bluey or Barbie every few seconds, ready to kick off a fresh cycle of attraction, addiction, suffering, and coercion.

98.     Recognition of this explains an otherwise inexplicable fact about Budge's offerings in the Subject Apps: the games are hollow shells, offering little if anything by way of legitimate childhood entertainment, even with a paid subscription. This intuitively makes little sense in a "traditional" ad-based model; if the money is coming from the ads, a developer would seek to make the best game possible to maximize playtime within the game and thus exposure to ads. But it makes perfect sense in the greater context of Budge as a business: why spend millions of dollars developing a high quality game that Budge can lease for $10 a month, when Budge can spend considerably less developing a whole suite of low quality games that a) each generate a monthly subscription fee (and if parents forget to cancel once the child grows bored, all the better), and b) serve as input feeds into all the other games. In the upside-down world of Budge, children are to be exploited, ads run for the same company that is running them, and games are designed to be boring.

99.     Thus, on the one hand, Budge makes specific false representations to parents in the App Store and Play Store that the games are suitable for young children, when they are not. On the other hand, the entire Budge business model and its whole suite of unscrupulous practices comprise a single course of unfair competition, in which the manipulation, exploitation, and immiseration of children and their parents is fundamental to the success of the venture. This Complaint challenges both forms of misconduct.

## G.    The Subject Apps Are Similarly Dominated by Manipulative and Addictive Designs, Stealth Marketing, and Dark Patterns

100.    Like its Paw Patrol app, Budge's other Subject Apps are dominated by manipulative and addictive design techniques, stealth marketing, and dark patterns, including in the form of lures,

parasocial relationship pressures, time-based pressure, and navigation constraints, all with the goal of prolonging gameplay and inducing in-app purchases.

101.    Budge markets all of the Subject Apps on the Apple App Store and/or Google Play Store as appropriate and suitable for toddlers and young children, as reflected in the following table:

| App | Apple App Store | Google Play Store |
|---|---|---|
| Bluey: Let's Play | "Fun Kids Game for Boys & Girls"<br><br>"Fun, easy & calm kids learning game for boys and girls of all ages."<br><br>"Preschool children and toddlers will enjoy this app."<br><br>"SAFE & KID FRIENDLY"<br><br>"Fun kids games designed for preschool, kindergarten, elementary school girls & boys, based on their favorite show available on YouTube, YouTube Kids & Disney+. This interactive Bluey game is easy and fun to play for children aged 2-9." | "Fun, easy & calm kids learning game for boys and girls of all ages."<br><br>"Preschool children and toddlers will enjoy this app."<br><br>"SAFE & KID FRIENDLY"<br><br>"Fun kids games designed for preschool, kindergarten, elementary school girls & boys, based on their favorite show available on YouTube, YouTube Kids & Disney+. This interactive Bluey game is easy and fun to play for children aged 2-9." |
| Hello Kitty Nail Salon | "Easy and fun to play girls game for all ages"<br><br>"Fun Nail salon game for girls and kids of all ages." | |
| Strawberry Shortcake Bake Shop | "Cake Maker & Kid Baking Games" | "Step-by-step instructions so fun for kids of all ages!" |
| Barbie Dreamhouse Adventures | "Girl Games Doll House Fun"<br><br>"Fun games for girls and boys, pre teens, kids and all ages." | "Fun games for girls, boys and kids of all ages." |

CLASS ACTION COMPLAINT

| Caillou Check Up: Doctor Visit | "Fun & Educational Activities"<br><br>"Go to the doctor's office with Caillou and solve fun mini-games that teach kids all about the human body."<br><br>"11 mini-games designed for toddlers and preschoolers" | "Go to the doctor's office with Caillou and solve fun mini-games that teach kids all about the human body."<br><br>"11 mini-games designed for toddlers and preschoolers" |

102.    In addition, each of the Subject Apps prominently displays the familiar characters from the child television shows or child toys, thus conveying the uniform message that the game is appropriate for a young child audience. No reasonable consumer would believe that these "games" are intended for anyone but small children based on the textual and visual elements of Defendant's marketing, which, again, is based around extremely popular and well known characters.

103.    The Subject Apps all leverage "parasocial relationships" to prolong gameplay and induce in-app purchases. For example, in the Barbie Dreamhouse Adventures app, the child is immediately introduced to "Barbie," who tells the child about the fun things to do in her dreamhouse. After navigating to the house, Barbie tells the child, "Let me show you a **super-secret friend** trick. Start by placing **friends** in the dreamhouse!" The bottom of the screen is populated with a menu of characters, only one of which (in addition to Barbie) is free. But if the child clicks on the "free" friend, *that character disappears*, leaving the child with only "locked" friends. Barbie further entices the child, "Tap on any dreamhouse friend to see something new and awesome!" By tapping on one of the characters (again, all of which are locked), the child is immediately taken to the subscription page, where Barbie says, "When you join the dreamhouse VIP **club**, you'll unlock all of the characters and their outfits. VIP club members get more coins in every bonus gift, and you'll get access to all of the activities in the house. **Wow!**" At every turn, Budge deploys Barbie and "friends" to pressure in-app purchases.

104.    The Subject Apps also contain numerous "navigation constraints." For example, immediately upon opening the Bluey: Let's Play app, the child is met with an advertisement and encouragement from the narrator to click on the ad: "Come see what's new!"; "There's so much to see!"; "Let's play and create!"; "Let's do this!" For the first 5-10 seconds, the ad does not have an "X" to navigate away from the advertisement and instead has a pulsating button "Let's Go!," which, if clicked,

35

takes the child to a screen to purchase a subscription. Like the other Subject Apps, the Bluey app is effectively a full-length advertisement.

105.    The Subject Apps also are riddled with "time-based pressure" tactics. For example, in the Hello Kitty Nail Salon app, after completing one of only two free portions of the app, the child is encouraged to complete more nail designs to receive more rewards. A countdown clock is placed next to an icon for the "Hello Kitty Nail Club," where the child is told they can receive more rewards. Clicking the icon takes the child to a screen to purchase a subscription.

106.    Finally, the Subject Apps deploy multiple "lures" in the form of variable rewards and other casino-style effects that prolong gameplay and induce in-app purchases. For example, in the Caillou app, completion of minor tasks is rewarded with exploding confetti, stars, and balloons. The child is also rewarded verbally by the Caillou character with phrases like, "You're good at this!" Mixed in with the variable rewards, the child is shown advertisements for other Budge apps. Within the first few minutes, the child exhausts all free options within the app, and by clicking on any of the remaining options, Caillou tells the child, "To play that activity, you'll need to unlock full checkup!"

107.    These design techniques all have the same goal: to keep the child captivated and playing for as long as possible, and, ultimately, to get the child's parent or legal guardian to make purchases once the child has been subjected to defendant's unfair practices. In other words, despite touting its child-focused bona fides, to Budge a child is really nothing more than a stepping stone to a parent's wallet.

**H.    "We've Tried Just About Everything": Defendant's Manipulative Designs are Intentional**

108.    Defendant's deployment of these manipulative techniques and dark patterns is intentional and the product of deliberate testing and experimentation by the game developers. In a 2015 presentation by Budge Studios co-founder, Michael Elman, Elman stated, "We experimented ever since we started. We've done over 30 apps like this, and we've tried just about everything: different brands, different age groups, how much we should give away for free, where should we charge, how do we show it, what's appropriate. And we've learned a lot. Some things work better than others, and we've received a lot of

feedback. We test every app as much as we can not only in our studios in our play group live but also recently using the new test flight program from Apple."[48]

109.    In 2022, Budge Studios was acquired by Tilting Point, "a leading free-to-play publisher that powers up existing live games using deep marketing and product expertise, cutting-edge technology and a user acquisition war chest," and is "[r]ecognized as one of the top mobile game makers in the world."[49] In an interview with Tilting Point's CEO regarding the acquisition, the CEO said they would seek to "accelerate and amplify [Budge Studios'] business[] . . . through sophisticated performance marketing, app store optimization and featuring, and through the tremendous data insights we've built."[50] Indeed, Tilting Point touts its sophisticated AI and machine learning models that are designed to "achieve stronger results at a faster rate."[51] "Results" here are subscriptions from harried parents.

110.    Unleashing the full force of AI and machine learning to lure toddlers and young children into prolonged gameplay and in-app purchases—"sophisticated performance marketing" in the words of Tilting Point's CEO—is fundamentally unfair. This is particularly so when evidence suggests that children's defenses against even traditional advertising are already "overwhelmed."

111.    Budge Studios knows that toddlers and other young children who play its Subject Apps do not have their own bank accounts, credit cards, or other payment platforms to make the in-app purchases that fuel Defendant's freemium monetization model. Defendant thus deploys its Subject Apps and the associated manipulative design techniques with the intent of inducing the ultimate purchasers— the parents and legal guardians of the young children—to make the in-app purchases.

112.    Defendant uses the young children who play its app as intermediaries, co-opting their attention and creating pressure for in-app purchases, knowing that the app's manipulative design techniques will ultimately cause parents and legal guardians to engage in microtransactions and in-app purchases at the request of their children. Indeed, from Defendant's perspective, the worse they can make a child feel about *not* subscribing (guilt, embarrassment, disappointment, and unfulfilled

---

[48] https://www.youtube.com/watch?v=EnkOmqBVNSY (at 4:00).

[49]    https://www.businesswire.com/news/home/20220316005291/en/Tilting-Point-Acquires-Budge-Studios-Expanding-Into-Kids-Entertainment

[50] https://venturebeat.com/business/tilting-point/

[51] https://www.tiltingpoint.com/what-we-do/our-tech/

addiction), the more pressure (tantrums, sulking, other bad behavior) they will put on their parents to pay up. In other words, Budge's "games" intentionally cause the child to suffer as a means to access the parents' funds.

**I.    Plaintiffs' Experience**

113.    Plaintiff is the parent of a daughter who is four years old. In or about June 2024, Plaintiff's daughter asked Plaintiff to download the Paw Patrol app.

114.    Before downloading the Paw Patrol app, Plaintiff reviewed the app description on the Apple App Store, including the age rating for the app and the Paw Patrol photographs displayed on the App Store, which she recognized from the children's television show her daughter watched. Based on Budge's representations that the app was appropriate for very young children, Plaintiff downloaded the app and allowed her child to play the game.

115.    After playing the Paw Patrol app for a short period of time, Plaintiff's child asked her to purchase a subscription for the app, and Plaintiff did so for an initial price of $4.99. Approximately one month later, the app subscription automatically renewed at a price of $9.99.

116.    After the subscription for the Paw Patrol app automatically renewed, Plaintiff discontinued her child's use of the app because she realized her child was being continuously exposed to advertisements for additional Budge apps.

117.    Had Plaintiff known that the Paw Patrol app contained pervasive advertising that was embedded within the game in a manner that was deceptive to her child and that the advertisements continued despite paying for a subscription, she would not have paid money for the subscription.

118.    Plaintiffs' experience is representative of other parents who downloaded Budge's Subject Apps and left reviews on the Apple App Store and Google Play Store.

119.    For example, Figures 1, 2, and 3 are reviews regarding the Paw Patrol app:



★★★☆☆

agboard, 04/14/2022

**Fun for kid, painful for parents**
This game is a hit with my child, she loves the characters/graphics/things to do.
Unfortunately it's the prime example of predatory advertising towards children. I find it
disturbing your game is designed for 3-7 year olds and every touch or turn prompts a "you
need to buy this character to unlock this feature". These options shouldn't be an in game
prompt it should be directed at parents and only parents in a separate section of the
settings. Also I get that you need to pay your artists and IT people but it's ridiculous that
such a basic game when all features are unlocked cost over $100 and I'm sure that price will
continue to rise when wildcat and Rex and Zumba are released. The fact I had to pay for
"Dino character skins" when all the characters were already purchased on the other section
also seems incredibly shady especially when the new features can be beaten in 30 minutes
of playing.

In all the game is fun for kids and well designed....but the price gouging and predatory
advertising has left a sour taste in our mouths...this will be the last paw patrol related
expense we make.

**Figure 1**

CLASS ACTION COMPLAINT

1
2

Jon Clement      ⋮

3
4 ★ ☆ ☆ ☆ ☆  April 25, 2024
5 This is just shameless. Everything is nearly locked. My kid can't get two steps in the game without full
   screen ads or it asking to pay money for something. It will even guide you to click on things that cost
6 money. And then 9.99 A MONTH!? Thats a full service price for a static game. All it's done is made
   everyone frustrated. SHAMELESS
7
   4,748 people found this review helpful
8 Did you find this helpful?  [ Yes ]  [ No ]
9

10 **Figure 2**

11

12 T   Tatyana T      ⋮

13 ★ ★ ★ ☆ ☆  March 15, 2022
14 The game is very nice. However, I am disappointed with the tricky and unfair tactics used to charge people more and annoying
   them while using the game. I paid around $27 for my child to enable all of the pups, only to have 2 available and the rest
15 showing "Coming soon" for some time now. Also, while playing the game, my child is being led to different "areas" where it is
   asking us to upgrade again. And it is very difficult and time consuming to get out of that mode to continue the game.
16
   4,940 people found this review helpful
17 Did you find this helpful?  [ Yes ]  [ No ]

18
19 **Figure 3**
20
21      120.    Similar complaints were voiced by parents regarding other Subject Apps, as illustrated
22 by Figures 4 and 5:
23
24
25
26
27
28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21

**Figure 4**

22
23
24
25
26
27
28

41



**Figure 5**

**J.      Plaintiff's Allegations Establish the Who, What, When, and Where of Defendant's Misconduct**

121.    Plaintiff's allegations satisfy the who, what, when, and where requirements of Fed. R. Civ. P. 9(b).

122.    **Who**: Defendant Budge Studios.

123.    **What**: Defendant engages in the following deceptive and unfair conduct:

a. Targeting toddlers and other young children with manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases;

b. Falsely advertising to parents that the Subject Apps are suitable and appropriate for young children, when, in fact, the apps deploy manipulative and addictive design techniques, stealth marketing, and dark patterns that are harmful and deceptive to young children; and

c. Concealing material facts concerning the continued deployment of stealth marketing and dark patterns designed to induce additional purchases even after the parent/legal guardian pays for a subscription.

124. **When**: Defendant engaged in the deceptive conduct with respect to Plaintiff and her child when Plaintiff downloaded the Paw Patrol app in or about June 2024, her child began playing the app, and Plaintiff paid for a subscription shortly thereafter.

125. **Where**: The unfair conduct targeted at young children occurs within the Subject Apps, as does the concealment of material facts from parents concerning the continued deployment of advertising even after paying for a subscription. Budge's misrepresentations concerning the suitability of the Subject Apps for young children occur within the Apple App Store and Google Play Store.

## VI.   CLASS ALLEGATIONS

126. Plaintiff brings this action individually and on behalf of all others similarly situated. The class sought to be represented in this action is defined as follows:

> All parents and/or legal guardians in California who, within the Class Period, downloaded one of Defendant's Subject Apps for their child[ren] and made in-app purchases, including subscriptions.

127. The Class Period dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was originally filed. Excluded from the Class are: a) any officers, directors, or employees of the Defendant; b) any judge assigned to hear this case; c) any judge assigned to hear this case (or spouse or family member of any assigned judge); c) any employee of the Court; and d) any juror selected to hear this case.

128.     Plaintiff reserves the right to modify or amend the above-referenced definitions before the Court determines whether certification is appropriate.

129.     Defendant subjected Plaintiff and the Class to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

130.     **Numerosity of the Classes:** Members of the Class are so numerous that their individual joinder herein is impracticable. The Defendant's Subject Apps are used by thousands if not millions of minors whose parents/guardians would be class members under the above definition. The individual class members are ascertainable as the names and contact information of all class members can be identified in the business records maintained by Defendant. The precise number of members of the Class numbers in the high thousands or millions and can only be obtained through discovery, but the numbers are more than can be consolidated in one complaint and it is impracticable for each to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

131.     **Ascertainable Class:** The proposed Class is ascertainable. The litigation of the questions of fact and law involved in this action will resolve the rights of all members of the Class and hence will have a binding effect on all class members. These class members can be readily identified from business records, billing systems, and other records of Defendant and by other means readily available to the Defendant, and thus by the Plaintiff through minimal discovery. The class is numerous. Joinder of all class members is impracticable due to the relatively small monetary recovery for each class member in comparison with the costs associated with separate litigation.

132.     **Commonality:** There are questions of law and fact that are common to the Plaintiff's and class members' claims. These common questions of law and fact exist as to all members of the class and predominate over the questions affecting only individual members of the class. These common questions are likely to result in common answers through this litigation. Among such common questions of law and fact are the following:

    a.   Whether Defendant markets its app as suitable for children;

    b.   Whether Defendant advertises to children within the app;

c.   Whether Defendant's representations to the public, including children using its app, are deceptive;

d.   Whether Defendant's representations to parents via the Apple App Store and Google Play Store were deceptive;

e.   Whether Defendant's conduct was unlawful or unfair in violation of the UCL;

f.   Whether Defendant's conduct was unfair in violation of the Federal Trade Commission Act section 5;

g.   The proper measure of damages;

h.   The nature and extent of any declaratory or injunctive relief to which Plaintiff or the Classes may be entitled.

133.   **Typicality:** Plaintiff is a member of the Class and Plaintiff's claims are typical of the claims of members of the Class. Typical of other Class members, Plaintiff spent money on Defendant's apps after she downloaded the apps for her child and after being exposed to Defendant's deceptive advertising. Plaintiff and the Class each sustained, and will continue to sustain, damages arising from Defendant's common and uniform course of wrongful conduct, as alleged more fully herein. Plaintiff's claims are founded on the same legal theories as those of the Class.

134.   **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in the prosecution of complex class actions involving consumer protection claims. Plaintiff has no interests contrary to those of the class members, and will fairly and adequately protect the interests of the Classes.

135.   To prosecute this case, Plaintiff has retained the law firm of Zimmerman Reed LLP. This firm has extensive experience in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

136.   The questions of law or fact common to Plaintiff's and each Class Members' claims predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiff and the unnamed class members are based on the conduct engaged in by Defendant as part of its ordinary course of business.

137.   **Superiority:** The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are class members who are unlikely to join or bring an action due to, inter alia, reluctance to sue Defendant and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of litigation among the Class Members in relationship to the benefits received. The damages, restitution, and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual class members' claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefit of single adjudication, economy of scale, and comprehensive supervision by a single court.

138.   In the alternative, the above-referenced class may be certified because:

a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual class members' claims which would establish incompatible standards of conduct for Defendant;

b.   The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other members of the classes who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and

c.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE "UNFAIR PRONG" OF THE UNFAIR COMPETITION LAW

### ("UCL")

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

139.    Plaintiff incorporates each factual allegation set forth above.

140.    Plaintiff is a "person" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

141.    Plaintiff brings this claim individually and on behalf of the Class pursuant to section 17200 *et seq.* of the Business & Professions Code, the Unfair Competition Law, against Defendant.

142.    The UCL prohibits unfair competition defined to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

143.    Defendant has violated and continues to violate the UCL's bar against "unfair" business practices.

144.    Defendant's unfair conduct is illegal, immoral, unscrupulous, and substantially injurious to consumers. Targeting toddlers and other young children with manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases violates basic principles of morality and good-faith business practices. It also causes injury to the young children who are manipulated and hooked to Defendant's apps and the parents/legal guardians who lose money and the benefit of their bargain as a result of Defendant's unfair conduct.

145.    Defendant's conduct also has effects that are comparable to or the same as conduct that legislatures have declared to be harmful to young children, including in:

      a.  the Children's Television Act of 1990, in which Congress declared that "special safeguards are appropriate to protect children from overcommercialization on television," and that "television station operators and licensees should follow practices in connection with children's television programming and advertising that take into consideration the characteristics of this child audience"; and

b. the California Age-Appropriate Design Code Act, Cal. Civ. Code §§ 1798.99.28, *et. seq.*, which, among other things, prohibits businesses from deploying "dark patterns to lead or encourage children . . . to take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being." Cal. Civ. Code § 1798.99.31.

146.    The negative impact of Defendant's conduct on young children and their parents/legal guardians outweighs the reasons, justifications, and motives for Defendant's conduct. There is no social benefit to Defendant's exploitation of young children through the means described above, which is unlawful and violates clearly articulated public policy. The only beneficiary of Defendant's conduct is Budge Studios, which reaps the rewards of in-app purchases, subscriptions, and microtransactions at the expense of young children and their families.

147.    Defendant deployed its manipulative and deceptive marketing campaign within the Paw Patrol app and other Subject Apps with the intent to induce in-app purchases by the parents and/or legal guardians of the young children who were subjected to the unfair practices.

148.    Defendant intends that child players of its Subject Apps will exert pressure on their parents on Budge's behalf to induce expenditures on the Subject Apps, such that Defendant is advertising not only to the child, but to the parent *through* the child.

149.    Plaintiff has suffered an injury in fact and has lost money or property as a result of Defendant's conduct. Defendant engaged in unfair and deceptive advertising targeting young children with intent to influence the behavior of the ultimate purchaser—parents and legal guardians of the children—and Defendant succeeded in its plan of inducing in-app purchases. Plaintiff paid money for a Paw Patrol Rescue World subscription as a direct result of Defendant's unfair conduct.

150.    Had Plaintiff known that the Paw Patrol app was dominated by manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases and was therefore fundamentally inappropriate for toddlers and other young children and that her child would continue to be subjected to such tactics even after purchasing a subscription, Plaintiff would not have paid money for the subscription.

151.    Plaintiff remains in the market for digital entertainment for her child, and Defendant continues to partner with producers of immensely popular children's content. Plaintiff's child consumes popular child-targeted media content including content with characters or other properties that have been made into Budge games. Plaintiff is open to continue to pay for app-based games based on popular children's characters, including those developed by Budge, and would like to continue to do so, but is unable at present because Plaintiff is unable to rely on Defendant's representations that the games are suitable for children and free from addictive and manipulative design techniques.

152.    Defendant's violations of the UCL are ongoing and will continue unless restrained and enjoined.

153.    Accordingly, Plaintiff seeks restitution from Defendant of all money obtained from Plaintiff as a result of Defendant's unfair competition, and public injunctive relief on behalf of the general public to prevent Defendant from continuing its unfair practices.

154.    An injunction preventing Defendant from facilitating and profiting off the conduct described would primarily benefit the general public, including children and parents who are yet to encounter Defendant, as it would end an unfair business practice on a prospective basis, and because no such injunction would require resort to any facts peculiar to Plaintiff or a class of similarly situated individuals. Plaintiff would benefit from any such injunction only in the same way as, or as, a member of the general public.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE "UNLAWFUL PRONG" OF THE UNFAIR COMPETITION LAW**

**("UCL")**

**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

155.    Plaintiff incorporates each factual allegation set forth above.

156.    Plaintiff and Defendant are "persons" within the meaning of the UCL.

157.    Plaintiff brings this claim individually and on behalf of the Class pursuant to section 17200 *et seq.* of the Business & Professions Code, the Unfair Competition Law, against Defendant.

158.   California's UCL prohibits unfair competition, which includes any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

159.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

160.   Defendant committed, and continues to commit, "unlawful" business acts or practices by, among other things, its violation of the following laws:

   a. The Federal Trade Commission Act section 5 (15 U.S.C. § 45): As alleged throughout, Defendant's conduct constitutes "unfair or deceptive acts or practices in or affecting commerce";

   b. Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5) & (7): As alleged below, Defendant's conduct violates section 1770(a)(5) & (7) of the CLRA, in turn violating the UCL's "unlawful" provision;

   c. The False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500: As alleged throughout, Defendant falsely advertises the Subject Apps as suitable for young children, when, in fact, the apps deploy manipulative and addictive design techniques, stealth marketing, and dark patterns that are harmful and deceptive to young children.

161.   Plaintiff reserves the right to allege other violations of law that constitute other unlawful business practices. The unlawful conduct alleged is ongoing and continues to this date. Unless restrained and enjoined by an order of this Court, Defendant will continue to engage in the unlawful conduct described.

162.   Defendant's misrepresentations concerning the suitability of the Subject Apps for young children are deceptive to a reasonable consumer because they give the false impression that the Subject Apps are free from manipulative and addictive design techniques, stealth marketing, and dark patterns that are deceptive and harmful to young children.

163.   Defendant's misrepresentations are material because a reasonable parent or legal guardian would attach importance to the suitability of an app for young children in determining his or her choice of action in downloading the app and making in-app purchases.

164.   Defendant also made material omissions concerning the continued deployment of stealth marketing and dark patterns designed to induce additional purchases even after the parent/legal guardian pays for a subscription.

165.   Plaintiff has suffered an injury in fact and has lost money or property as a result of Defendant's unlawful conduct.

166.   Had Plaintiff known that the Paw Patrol app was dominated by manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases and was therefore fundamentally inappropriate for toddlers and other young children and that her child would continue to be subjected to such tactics even after purchasing a subscription, she would not have paid money for the subscription.

167.   Plaintiff remains in the market for digital entertainment for Plaintiff's child, and Defendant continues to partner with producers of immensely popular children's content. Plaintiff's child consumes popular child-targeted media content including content with characters or other properties that have been made into Budge games. Plaintiff is open to continue to pay for app-based games based on popular children's characters, including those developed by Budge, and would like to continue to do so, but is unable at present because Plaintiff is unable to rely on Defendant's representations that the games are suitable for children and free from addictive and manipulative design techniques.

168.   Defendant's violations of the UCL are ongoing and will continue unless restrained and enjoined.

169.   Accordingly, Plaintiff seeks restitution from Defendant of all money obtained from Plaintiff as a result of Defendant's unlawful conduct, and public injunctive relief on behalf of the general public to prevent Defendant from continuing its unlawful practices.

170.   An injunction preventing Defendant from facilitating and profiting off the conduct described would primarily benefit the general public, including children and parents who are yet to encounter Defendant, as it would end an unlawful business practice on a prospective basis, and because

no such injunction would require resort to any facts peculiar to Plaintiff or a class of similarly situated individuals. Plaintiff would benefit from any such injunction only in the same way as, or as, a member of the general public.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")

### (Cal. Civ. Code §§ 1750, *et seq.*)

171.    Plaintiff incorporates each factual allegation set forth above.

172.    Plaintiff is a "consumer" as that term is defined by Civil Code § 1761(d), because they spent money via Defendant's app for personal, family, or household purposes.

173.    Plaintiff has engaged in a "transaction" with Defendant, as that term is defined in Cal. Civ. Code § 1761(e).

174.    Defendant's conduct as alleged in this Complaint constitutes unfair and deceptive acts and practices under the CLRA.

175.    The CLRA prohibits, "[r]epresenting that goods or services have . . . characteristics, . . . [or] benefits . . . that they do not have." Cal. Civ. Code § 1770(5).

176.    The CLRA also prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another." Cal. Civ. Code § 1770(7).

177.    Defendant violated the CLRA by representing within the Apple App Store and Google Play Store that its Subject Apps are appropriate for preschoolers, toddlers, and children as young as four years old, while concealing and omitting that the app contained manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases, which makes the games deceptively marketed and harmful to young children.

178.    Defendant's misrepresentations are likely to deceive reasonable consumers because they give a false impression that the Subject Apps are appropriate for even very young children, when in fact they are deceptive, harmful, and exploitative.

179.    Defendant's misrepresentations were made on the Apple App Store and Google Play Store each time Plaintiff and Class Members downloaded the app onto their devices.

180.   Defendant's misrepresentations are material because a reasonable parent or legal guardian would attach importance to the suitability of an app for young children in determining his or her choice of action in downloading the app and making in-app purchases.

181.   Further, the misrepresentations are material to a reasonable consumer because they provide the first and potentially only description of the app to parents and legal guardians who decide whether to download the app in the first place. In its "best practices" for providing app descriptions, Google advises developers, "Your app or game's store listing is the first thing a user sees when they browse or search Google Play for their next great app or game experience."[52] Indeed, the first bullet point for app descriptions states, "Make sure your app's description accurately describes its functionality and content."[53] Defendant's false description of the Subject Apps as appropriate for toddlers and young children is a material fact.

182.   Defendant also made material omissions concerning the continued deployment of stealth marketing and dark patterns designed to induce additional purchases even after the parent/legal guardian pays for a subscription.

183.   As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and the Class suffered harm in the form of lost money through in-app purchases. Had Plaintiff known that the Paw Patrol app was dominated by manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases and was therefore fundamentally inappropriate for toddlers and other young children and that her child would continue to be subjected to such tactics even after purchasing a subscription, Plaintiff would not have paid money for the subscription.

184.   Under Cal. Civ. Code § 1782(d), Plaintiff seeks an order enjoining the wrongful acts described herein. Plaintiff further seeks prospective public injunctive relief for the benefit of the general public, including individuals who have yet to encounter Defendant.

185.   Plaintiff and the Class reserve their right to assert claims for damages under the CLRA in subsequent pleadings, but do not seek damages under the CLRA at this time or through this

---

[52] https://support.google.com/googleplay/android-developer/answer/13393723?hl=en
[53] *Id.*

Complaint. In accordance with California Civil Code § 1782, Plaintiff's counsel will send a notice to Defendant's principal place of business notifying Defendant of its CLRA violations and demanding it bring its business practices in line with the law. Should Defendant fail to comply with Plaintiff's demands, after thirty days Plaintiff will amend this Complaint to seek damages on behalf of Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**

**(Bus. & Prof. Code §§ 17500 *et. seq.*)**

186.    Plaintiff incorporates each factual allegation set forth above.

187.    California's False Advertising Law, California Business and Professions Code section 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

188.    Defendant has violated, and continues to violate, Section 17500 of the Business and Professions Code by disseminating untrue and misleading advertisements to Plaintiff and the Class.

189.    Defendant violated Section 17500 by representing within the Apple App Store and Google Play Store that its Subject Apps are appropriate for preschoolers, toddlers, and children as young as four years old, while concealing and omitting that the app contained manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases, which makes the games deceptive and harmful to young children.

190.    Defendant's advertising is likely to deceive reasonable consumers because it gives a false impression that the Subject Apps are appropriate for even very young children, when in fact they are deceptive, harmful, and exploitative.

191.    Defendant's misrepresentations were made on the Apple App Store and Google Play Store each time Plaintiff and Class Members downloaded the app onto their devices.

192.    Defendant's misrepresentations are material because a reasonable parent or legal guardian would attach importance to the suitability of an app for young children in determining his or her choice of action in downloading the app and making in-app purchases.

193.    Defendant also made material omissions concerning the continued deployment of stealth marketing and dark patterns designed to induce additional purchases even after the parent/legal guardian pays for a subscription.

194.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendants' false and misleading representations. Had Plaintiff known that the Paw Patrol app was dominated by manipulative and addictive design techniques, stealth marketing, and dark patterns designed to prolong gameplay and induce in-app purchases and was therefore fundamentally inappropriate for toddlers and other young children and that her child would continue to be subjected to such tactics even after purchasing a subscription, she would not have paid money for the subscription.

195.    Pursuant to Business and Professions Code section 17535, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to disseminate false and misleading advertising regarding the Subject Apps.

196.    Plaintiff and the Class also seek an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant by failing to disclose the existence and significance of its misrepresentations, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION

197.    Plaintiff incorporates each factual allegation set forth above.

198.    As alleged more fully above, Defendant made false representations and material omissions of fact to Plaintiff and the Class concerning the suitability of the Subject Apps for young children and toddlers and the continued deployment of stealth marketing and dark patterns even after paying for a subscription.

199.    These representations were false and omissions deceptive.

200.   When Defendant made these misrepresentations and omissions, it knew that they were false at the time that it made them and/or acted recklessly in making the misrepresentations and omissions.

201.   Defendant intended that Plaintiff and the Class rely on these representations and omissions and Plaintiffs and Class read and reasonably relied on them.

202.   In addition, Class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to make in-app purchases within the Subject Apps.

203.   Defendant's misrepresentations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the Class.

204.   Plaintiff and the Class were injured as a direct and proximate result of Defendant's conduct because they would not have made in-app purchases within the Subject Apps if they had known that the representations were false.

## SIXTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

205.   Plaintiff incorporates each factual allegation set forth above.

206.   As alleged more fully above, Defendant made false representations and material omissions of fact to Plaintiff and the Class concerning the suitability of the Subject Apps for young children and toddlers.

207.   These representations were false.

208.   When Defendant made these misrepresentations, it knew or should have known that they were false. Defendant had no reasonable grounds for believing that these representations were true when made.

209.   Defendant intended that Plaintiff and the Class rely on these representations and Plaintiff and Class read and reasonably relied on them.

210.   In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to make in-app purchases within the Subject Apps.

211.   Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the Class.

212.   Plaintiff and the Class were injured as a direct and proximate result of Defendant's conduct because they would not have made in-app purchases within the Subject Apps if they had known that the representations were false.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the general public, prays for relief and judgment against Defendant as follows:

a.   Declaratory relief finding that Defendant's conduct violates the statutes set forth above;

b.   Declaratory relief that Defendant's practices herein are unlawful;

c.   Damages in an amount to be proven at trial;

d.   Restitution under the FAL and UCL in an amount to be proven at trial;

e.   Pre-judgment interest as permitted by law;

f.   Prospective public injunctive relief for the benefit of the general public enjoining the above-described unlawful and unfair conduct;

g.   Such other relief as the Court considers to be just and proper, including all forms of relief available under the UCL, CLRA, and FAL, with the exception that Plaintiff does not seek monetary relief under the CLRA at this time but will amend this Complaint to do so after thirty days after the sending of the notice required by Cal. Civ. Code § 1782.

### DEMAND FOR JURY TRIAL

213.   Plaintiff, on behalf of herself and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

**ZIMMERMAN REED LLP**

Date: September 20, 2024          By:      /s/ Caleb Marker
                                          Caleb Marker
                                          caleb.marker@zimmreed.com
                                          Flinn T. Milligan
                                          flinn.milligan@zimmreed.com
                                          6420 Wilshire Blvd., Suite 1080
                                          Los Angeles, CA 90048

**ZIMMERMAN REED LLP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ryan J. Ellersick (*Pro Hac Vice forthcoming*)
ryan.ellersick@zimmreed.com
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone (480) 348-6400
Facsimile (480) 348-6415

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT